*NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JUAN ZALAZAR,

        Plaintiff,

        v.

ERICA STEM, et al.,

        Defendants.

Civil Action No. 16-7092 (SDW)

**OPINION**

**WIGENTON**, District Judge:

This matter comes before the Court on Defendants' motion for summary judgment. (ECF Nos. 51-53). Plaintiff failed to respond to the motion or file a statement of material facts in dispute. (ECF Docket Sheet). For the reasons set forth below, this Court will grant the motion and will enter judgment in favor of Defendants as to all of Plaintiff's remaining claims.

**I. BACKGROUND**

Because Plaintiff has failed to oppose or otherwise dispute Defendants' statement of material facts not in dispute submitted in support of Defendants' motion for summary judgment (ECF No. 53), this Court considers Defendants' statement of facts undisputed and admitted for the purposes of this opinion. Fed. R. Civ. P. 56(e)(2); Local Civil R. 56.1. The following facts are thus drawn from Defendants' statement of material facts and Plaintiff's statements during his deposition.

Plaintiff, Juan Zalazar, was initially committed to the Special Treatment Unit ("STU") as a Sexually Violent Predator ("SVP") in 2005. (ECF No. 53 at 1). Following a conviction for

possessing an internet-capable electronic device, Plaintiff spent approximately two years in state prison before being returned to civil commitment at the STU in June 2014. (*Id.* at 2). Throughout his time in the STU, Plaintiff has received varying levels of psychological treatment, which he contends was improperly interrupted by the actions of the remaining Defendants. (*Id.*; *see also* ECF No. 1).

One of the major sources of interruptions in Plaintiff's treatment during his time on the STU, however, was Plaintiff's frequent disciplinary infractions which led to his placement on Modified Activity Program ("MAP") status. As Plaintiff himself explained MAP status is a treatment "tool" used by the mental health officials employed by the New Jersey Department of Human Services ("DHS") at the STU to address poor behavior through a series of four stages during which SVPs are initially stripped of most of their institutional freedoms and privileges until they are deemed to be fit to return to full treatment status. (Document 3 attached to ECF No. 43 at 40-43). While the Department of Corrections ("DOC") officers at the STU, who handle security issues at the facility, can place SVPs in temporary close custody for a period of up to seventy-two hours after a disciplinary incident occurs, DOC officers have "absolutely nothing to do with MAP," and thus have "absolutely no say-so" on whether SVPs who commit disciplinary infractions are placed onto MAP limited treatment status. (*Id.* at 43-44). Once the seventy-two hours of close custody expire following a disciplinary incident, the DOC officers must "put [SVPs] right back into general population" unless DHS officials, who have "complete oversight, complete autonomy on who gets MAP," determine that the SVP should be placed into MAP status. (*Id.* at 44).

The STU's resident guide describes MAP as follows:

> The Modified Activities Program is a component of clinical treatment at the STU that focuses on stabilizing and enhancing disruptive or dangerous behaviors. MAP consists of four distinct levels: Room, Tier, Wing, and Program. Room, Tier, and Wing restrict the unescorted motion of a Resident to those respective areas. Such restrictions are implemented subsequent to behaviors that pose a danger to self or others. The degree of restrictions of unescorted motion will be commensurate with the apparent danger. The levels of MAP represent increasing return of privileges culminating in return to the general STU population with all privileges reinstated.
>
> In progressing through the levels of MAP, current functioning, historical functioning, behavioral patterns, and the need for the Resident to control antisocial impulses for a significant duration will be considered.

(*Id.* at 95). According to the resident guide, MAP placement "will occur immediately following any incident wherein a Resident seems to be unwilling to control antisocial behaviors." (*Id.*). Following placement on MAP, an initial review is conducted during which DHS staff reviews the placement with the SVP after which the staff will recommend a level of MAP placement for the resident. (*Id.*). The SVP will thereafter receive limited levels of treatment related to his MAP placement as he progresses through the four levels until he is eventually readmitted to the general population once DHS staff members determine he should be release from MAP status. It is only on the return to the general population that the SVP resumes his sex offender specific, as opposed to MAP, treatment. (ECF No. 53 at 5).

During the two years prior to his filing of his current complaint,[1] Plaintiff spent multiple

---

[1] Because § 1983 actions such as this are subject to a two year limitations period, *see Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013), and because Plaintiff never filed a supplemental complaint alleging any wrongdoing after the filing of the complaint in this matter, the operative time period for this matter is the two years between October 2014 and the filing of the complaint in this matter in October 2016. *See, e.g., Aruanno v. Corzine*, 687 F. App'x 226, 229 n. 5 (3d Cir. 2017) (applicable time frame for a § 1983 action in New Jersey that was not amended or

3

periods of time in MAP status where he did not receive sex offender specific treatment. In his complaint, Plaintiff alleged that these placements resulted in his being denied sex offender treatment by Defendants, who are neither treatment staff nor DHS employees who have control over MAP placements. At his deposition, Plaintiff admitted that he had breached the rules of the STU in each of the incidents that resulted in MAP status between October 2014 and October 2016, stating that he "wasn't wrongly accused" and that "everything [he was] accused of, [he] did." (Document 3 attached to ECF No. 51 at 73-74). Plaintiff likewise acknowledged that violations of the disciplinary rules of the STU should "be curtailed [and] dealt with accordingly." (*Id.* at 37). Although Plaintiff in his complaint suggested that he had been falsely placed on MAP status by Defendants – most specifically Defendant Davis – multiple times, during his deposition he only identified one incident in which he believed he had been falsely accused. (*See id.* at 50). By Plaintiff's own admission, however, that single incident of an allegedly false accusation leading to MAP status after Davis claimed Plaintiff possessed contraband in the form of cigarettes occurred "after the lawsuit" in this matter was filed, and Davis told him that the alleged false accusation was "specifically [a result of] th[is] lawsuit." (*Id.* at 50, 66-67; ECF No. 53 at 6-7). Despite Plaintiff's allegation of a false allegation after and in retaliation for the filing of this matter, there is no record of Plaintiff being placed in either close custody or MAP status based on a claim that he possessed prohibited cigarettes after the filing of this case in October 2016. (ECF No. 53 at

---

supplemented by the filing of an amended or supplemental complaint is the two year period preceding the filing of the complaint); *Caldwell v. Fogel*, No. 08-728, 2009 WL 3048558, at * 5 (W.D. Pa. Sept. 21, 2009); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n. 9 (3d Cir. 2002) ("For the sake of clarity, a prisoner plaintiff (or any other plaintiff) should not be able effectively to amend [or supplement] a complaint through any document short of an amended pleading").

7). According to STU records, Plaintiff's MAP placements following the filing of this matter instead arose out of his having refused to leave another inmates room and the finding of a cell phone on October 4, 2016, Plaintiff's refusal to move to another cell in November 2016, and his being caught with yet another cell phone in March 2018. (*Id.* at 8-9).

In his complaint, plaintiff also claimed that Defendants denied him treatment by frequently having the STU's Special Operations Group ("SOG") conduct various operations inside the facility, including cell searches, each of which he claims caused a cancellation of treatment. (*See* ECF No. 53 at 9). During his deposition, Plaintiff "guess[ed]" that there were "between 20 and 30" of these operations during the period between October 2014 and October 2016. (Document 3 attached to ECF No. 51 at 54). In his complaint and during his deposition however, Plaintiff identified only a single instance in which the SOG disrupted the STU's normal operations by conducting cell searches – October 2, 2016.[2] (Document 3 attached to ECF No. 51 at 45-47). This incident, however, occurred on the weekend, and as Plaintiff admitted in his deposition, "there's no [treatment] groups on the weekends." (*Id.* at 48, 51-52).

In addition to the alleged SOG interruptions, Plaintiff also contends that his MAP groups or other treatment were disrupted at other times by certain Defendants. Specifically, Plaintiff claims that Defendant Davis prevented him from going to MAP group at some time in or around "2016," but could not remember the exact date or year in which this apparently occurred. (*Id.* at 61). Plaintiff further contends that treatment was cancelled again on October 6, 2016, while

---

[2] Plaintiff's complaint, which Plaintiff admits was prepared by another SVP, contains further allegations of similar incidents on October 4 and 5, 2016, but both of these incidents occurred while Plaintiff was either in temporary close custody or MAP status and was thus not entitled to or scheduled to attend sex offender treatment groups. (*See* ECF No. 53 at 10).

security cameras were installed. (Document 3 attached to ECF No. 51 at 64). At this time, however, Plaintiff was in MAP status and was not receiving sex offender treatment, and STU records indicate that treatment groups were otherwise meeting normally on that date. (ECF No. 53 at 10).

Although Plaintiff specifically identified the limited circumstances in which Defendant Davis was involved in the alleged reductions in his sex offender treatment during his deposition, Plaintiff failed to specifically identify any instances in which the Defendants Daye or Stem personally altered his treatment or any specific policy either put into place which resulted in reductions of his treatment. Instead, Plaintiff connected them to the alleged wrongs through their supervisory positions. As Plaintiff explained, Defendant Stem "was the number one [at the STU, s]he was like the warden." (Document 3 attached to ECF No. 51 at 49). Daye, in turn was "the higher up so he gives the okay. He's like the shift commander. The warden is the number one, but . . . when the warden's not here . . . the shift commander . . . runs the whole [STU]." (*Id.* at 50). Other than identifying them as supervisors and according them liability based on the actions of their presumed subordinates as such, Plaintiff connects Stem to the alleged wrongs in his complaint only insomuch as he spoke to her on one occasion about his treatment issues at some unspecified time at which point he was told that she didn't "care" about his treatment issues because the DOC staff controls only the security of the STU and does not provide treatment. (*Id.* at 69).

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *Id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014). "A nonmoving party has created a genuine issue of material fact if it

has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial." *Serodio*, 27 F. Supp. 3d at 550.

Pursuant to Federal Rule of Civil Procedure 56(e)(2) and Local Civil Rule 56.1, where, as here, the moving party files a proper statement of material facts and the non-moving party fails to file a responsive statement of disputed material facts, this Court is free to consider the moving party's statement of material facts undisputed and therefore admitted for the purposes of resolving the motion for summary judgment. *See, e.g., Ruth v. Sel. Ins. Co.*, No. 15-2616, 2017 WL 592146, at *2-3 (D.N.J. Feb. 14, 2017). Even where the defendants' statement of material facts is deemed admitted and unopposed, a district court is still required to "satisfy itself that summary judgment is proper because there are no genuine disputes of material fact and that [Defendants are] entitled to judgment as a matter of law" in order to grant summary judgment. *Id.* At 2 (citing *Anchorage Assocs. v. Virgin Islands Bd. Of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)).

**B. Analysis**

Following this Court's screening of this matter and Defendants' motion to dismiss certain of Plaintiff's claims, only one of Plaintiff's claims for relief remained – his contention that the remaining Defendants Stem, Davis, and Daye denied him his prescribed sex offender treatment for non-medical reasons in violation of his rights under the Due Process Clause of the Fourteenth Amendment. Defendants now move for summary judgment as to that claim. Although Plaintiff has only one class of claim remaining – his denial of treatment claim – that claim is made of several

8

sub-claims – that all Defendants denied him treatment by having him placed on MAP status under false pretenses or for unknown reasons, and that Defendants denied him treatment by cancelling treatment during SOG searches and the installation of security cameras. Defendants contend in their motion that Plaintiff has failed to show their personal involvement in these two denials of treatment, and that they are in any event entitled to qualified immunity.

"The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, (2011)).

A determination of the applicability of qualified immunity requires a two-pronged analysis. "First a court must decide 'whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right'[, a]nd second, the Court must determine 'whether the right at issue was clearly established at the time of [the] defendants alleged misconduct.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). At summary judgment, the "question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights . . . . Thus, crucial to the resolution of any assertion of qualified immunity is a careful examination of the record . . . to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant." *Thomas v. Christie*, 655 F. App'x 82, 84 n. 3 (3d Cir. 2016) (quoting *Rouse v. Plantier*, 182 F. 3d 192, 200 (3d Cir. 1999)).

Where it is dispositive, a district court may and often should address the question of the clear establishment of the alleged right in question first. *Spady*, 800 F.3d at 637. In addressing whether a claim is clearly established, the court must "frame the precise contours of [the] right" the plaintiff claims has been violated. *Id.* at 638. The Third Circuit has thus explained

> that courts are "not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084 (citations omitted). Instead, courts "must define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012). Accepting [a] broad version of the right at issue "would . . . convert the rule of qualified immunity that our cases plainly establish into a rule of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 [(1987)]. We are thus required to frame the right at issue "in a more particularized, and hence more relevant, sense," *Anderson*, 483 U.S. at 640, "in light of the case's specific context, not as a broad general proposition," *Saucier[ v. Katz*, 533 U.S. 194, 201 (2001)].

*Id.*

A right is clearly established either where there is applicable Supreme Court precedent which is directly on point, or where "existing precedent [has] placed the statutory or constitutional question *beyond debate*." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083). While the Supreme Court has yet to determine whether "a robust consensus of cases of persuasive authority in the Court[s] of Appeals," is sufficient to clearly establish a right for qualified immunity purposes, the Third Circuit has indicated that, at least in some circumstances, broad agreement between various Courts of Appeals may be sufficient to indicate that a right is clearly established. *Id.*; *see also Kedra v. Schroeter*, 876 F.3d 424, 450-51 (3d Cir. 2017). Thus, where "the firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right," the plaintiff's claim is clearly established, and qualified immunity will not shield the defendant's conduct. *Spady*, 800

F.3d at 637.

In his complaint, Plaintiff essentially couched his claims on relatively recent caselaw which found that persons subject to involuntary civil commitment whose release is dependent upon completion of psychological treatment have a Due Process right to that treatment which may be unconstitutionally impugned where systemwide changes made for non-medical reasons result in a reduction or elimination of required treatment for a quantifiable period of time. *See, e.g., Thomas v. Christie*, 655 F. App'x 82, 85 (3d Cir. 2016); *Leamer v. Fauver*, 288 F.3d 532, 546, 547 (3d Cir. 2002); *Thomas v. Adams*, 55 F. Supp. 3d 552, 576 (D.N.J. 2014) ("when a prescribed medical treatment is denied, reduced or changed for non-medical reasons, including financial, administrative or logistical, the [denied or reduced] treatment suggests an act of deliberate indifference and amounts to a violation of . . . substantive due process with regard to those mental patients whose sole hope for release hinges on obtaining their prescribed" treatment). The cases most directly on point – the District Court and Third Circuit decisions in *Thomas* – however, did not concern incidental reductions in treatment resulting from disciplinary/behavioral infractions or security related temporary cancellations of treatment during cell searches or during the installation of security equipment, but instead dealt with supervisory officials who made "systemwide determinations" that became "the moving force behind the circumstances under which the[ir] subordinate officers effectively have no choice but to deny/reduce/change an inmate's prescribed . . . treatment for non-medical reasons" in a manner where the change in treatment was foreseeable in relation to the systemwide determinations being made. *Thomas*, 655 F. App'x at 85.

Based on the only evidence Plaintiff has provided in this matter – his deposition testimony – the alleged right in question in his MAP placement related claim, defined at the proper level of

specificity, is entirely different. Plaintiff has identified no system wide policies or practices put into place by Defendants which have altered the nature or length of his treatment; instead Plaintiff seeks to hold Defendants liable for enforcing what he himself admitted were legitimate security and safety rules, and for placing him into close custody as a result of his admitted disciplinary and self-control failings, which resulted in wholly different individuals – the treatment staff of the DHS – placing him on MAP status. Plaintiff admitted that these Defendants, all of whom are employees of the DOC, had no right or authority to place him on or remove him from MAP status, and were thus responsible at most for placing him in temporary close custody so that the treatment staff could determine whether MAP placement was warranted. Plaintiff in his MAP related claim thus seeks to hold Defendants liable for enforcing rules he accepts as legitimate, and for temporary restraining him on that basis. Plaintiff has presented this Court with no basis for concluding that civilly committed SVPs have a right to be free from temporary restraint for a brief period of no more than seventy-two hours in close custody following their legitimate[3] violations of the rules of the facility to which they are committed and this Court is aware of no case law which clearly establishes such a right. Thus the right Plaintiff seeks to assert in his MAP related claim is not clearly established as a reasonable person in the place of Defendants would not be on notice from the applicable case law that they could be liable for alterations in treatment put into place by treatment staff after they enforced the security rules of the STU. As the right asserted in Plaintiff's MAP claim is not clearly established, Defendants are entitled to qualified immunity as to that

---

[3] As the only TCC/MAP placement which Plaintiff alleges was based on false charges occurred after the filing of the complaint in this matter, and as Plaintiff never amended or supplemented his complaint to include a claim based on that charge, the alleged false charge is not before this Court, and this Court need not reach the question of whether SVPs have a clearly established right to be free from TCC/MAP placements arising out of false disciplinary reports.

portion of his claim.[4]

In his remaining claims, Plaintiff seeks to hold Defendants liable for cancellations of treatment arising out of SOG cell searches and the installation of security cameras in the STU. Even putting aside the question of the clearly established prong of the qualified immunity issue, this claim suffers from several other issues. First, Plaintiff fails to provide any evidence or testimony specifically connecting any of the named Defendants to the actions of the SOG officers or of the installation crew. Instead, he seeks to hold Defendants Stem and Daye responsible for those cancellations because they, as supervisors, were responsible for the actions of their subordinate officers as such. Plaintiff's only testimony connecting these Defendants to his security related cancellation claim thus arises out of *respondeat superior* theory of vicarious liability. A plaintiff, however, may not hold a defendant liable based on such a theory of liability under § 1983. *Rode*, 845 F.2d at 1207-08. Instead, a § 1983 must establish that each defendant had "personal involvement in the alleged wrongs," *id.*, based either on their establishment of practices or policies which caused the alleged wrong, their personal direction of the bad actors to violate the plaintiff's rights, or their knowledge of and acquiescence to their subordinate's unlawful conduct. *Doe v. New Jersey Dep't of Corr.*, Civil Action No. 14-5284, 2015 WL 3448233, at *9 (D.N.J. May 29, 2015) (quoting *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316-20 (3d Cir. 2014), *rev'd on other grounds*, 135 S. Ct. 2042 (2015)); *see also Tenon v. Dreibelbis*, 606 F. App'x 681, 688 (3d Cir. 2015) (§ 1983 Plaintiff pleading supervisory liability

---

[4] This Court further notes that as the treatment staff, and not these Defendants, were responsible for all of Plaintiff's MAP placements, Defendants had no personal involvement in any resulting denial or reduction of treatment which resulted from Plaintiff's MAP placements, and could therefore not be liable for any such change in treatment arising from MAP placements under § 1983 in any event. *See, e.g., Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988).

must establish defendant's "participation [in the alleged wrong], or actual knowledge and acquiescence, to be liable"). As Plaintiff has not provided any testimony establishing a policy causing the alleged wrongs, nor has he asserted any viable theory of liability as to Defendants in this matter, he has provided no evidence to support any theory of liability other than *respondeat superior*. He has therefore failed to establish that these Defendants had any personal involvement in any denial of treatment resulting from the alleged treatment cancellations arising from the SOG searches in early October 2016 or the day long cancellation arising from the installation of security cameras. Defendants are thus entitled to judgment as a matter of law as to the security-related cancellations portion of Plaintiff's claims.

Plaintiff's allegations that his treatment was reduced or cancelled by these security issues suffers a further fatal flaw – on the only dates he has clearly identified for the SOG searches and the date of the camera installation, he would not have received any sex-offender treatment in any event because one of the identified dates fell on a weekend during which there is no such treatment, and the remaining identified dates occurred while Plaintiff was either in temporary close custody or on MAP status due to a legitimate safety/disciplinary violation which occurred in early October 2016, and Plaintiff admitted in his deposition that no sex offender treatment is received while on MAP or TCC status. Thus, Plaintiff would not have received any sex offender treatment on the dates he has clearly identified even if those security issues and cancellations had not occurred, and he therefore received no reduction or change in treatment as a result of the SOG searches and camera installation for which he has provided actual dates. Thus, even if this Court were to assume, *arguendo*, that SVPs have a right not to have their treatment postponed or cancelled for security sweeps or during the brief installation of security equipment, Plaintiff suffered no such

cancellation or postponement, and no violation of his right to treatment could have occurred on the dates he has identified. Petitioner's vague statement that there were between twenty and thirty other cancellation incidents arising out of SOG searches does not save his claim as that statement is little more than a vague and ambiguous allegation without any supporting evidence or concrete information - such as the date on which these events allegedly occurred, Plaintiff's status at the time, or description of what exactly occurred and what portion of the day's treatment was delayed or cancelled – which is insufficient to survive a motion for summary judgment. *See, e.g, Tapp v. Proto*, 404 F. App'x 563, 568 (3d Cir. 2010). Plaintiff has thus failed to show that these security related incidents denied him any treatment to which he was entitled, and thus even if he did have a clearly established right to not have his treatment altered by standard security procedures, Plaintiff has shown no evidence which would permit a jury to find a violation of that right. Defendants are therefore entitled to summary judgment as to this portion of Plaintiff's claims as well. As Defendants are entitled to qualified immunity and in turn judgment as a matter of law as to both facets of Plaintiff's alleged denial of treatment claims, judgment is entered in favor of Defendants as to all of Plaintiff's remaining claims.

### III. CONCLUSION

For the reasons stated above, this Court GRANTS Defendants' motion for summary judgment. (ECF Nos. 51-53). An appropriate order follows.

Dated: May 2, 2019                                *s/ Susan D. Wigenton*
                                                  Hon. Susan D. Wigenton,
                                                  United States District Judge